## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**TAMMY S. GUNN,**

  **Plaintiff,**

**vs.**                                                    **CASE NO. 1:06cv205-MP/WCS**

**MICHAEL J. ASTRUE,**[1]
**Commissioner of Social Security,**

  **Defendant.**

_____/

### REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the

decision of the Commissioner be reversed and remanded pursuant to sentence four of

42 U.S.C. § 405(g).

_____

[1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007,
and is automatically substituted as Defendant.  Fed. R. Civ. P. 25(d).

**Procedural status of the case**

Plaintiff, Tammy S. Gunn, applied for disability insurance benefits and supplemental security income (SSI) benefits on April 11, 2003.  R. 21.  Plaintiff's last day for eligibility for an award of disability insurance benefits was September 30, 2001, and she must show disability as of that date.  R. 22.  Supplemental security income benefits may be awarded, however, for a disability on or after the date of the application, April 11, 2003.

Plaintiff was 46 years old at the time of the administrative hearing (on November 6, 2005), had a 12th grade education, R. 560, and had past relevant work as a customer clerk, cashier, floor clerk, care giver, dishwasher, and maid.  R. 21.  Plaintiff alleges disability due to degenerative disc disease of the spine.

The Administrative Law Judge found that prior to the last date of insured status (September 30, 2001), Plaintiff had the residual functional capacity to do light work with postural limitations, and could then still do her past relevant work.  *Id.*  This resulted in a denial of the application for disability insurance benefits.  *Id.*

The Administrative Law Judge also found that as of the date of the decision (February 2, 2006), Plaintiff could do sedentary work.  R. 27.  Relying upon the "grids,"[2] the ALJ concluded that Plaintiff was not disabled for purposes of supplemental security income benefits because she could do sedentary work, was 46 years old, has a high school education, and had transferable skills from semi-skilled work previously performed.  *Id.*

---

[2] The Medical-Vocational Guidelines, 20 C.F.R. § 404.1569, and appendix 2 to subpart P.

Case No. 1:06cv205-MP/WCS

Plaintiff contends that the ALJ erred by failing to follow the Eleventh's Circuit's legal standard for the evaluation of a claimant's testimony regarding the degree of the disabling effects of pain that she suffers.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Pain and other symptoms reasonably attributed to a medically determinable

impairment are relevant evidence for determining residual functional capacity.  Social

Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or

non-exertional capacity, or both.  Id., p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  See Holt v. Sullivan, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so.  See Hale v.
> Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true.  See Cannon v. Bowen, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.
Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted).  "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

**Evidence from the administrative hearing**

Plaintiff testified that her disability concerned neck, shoulder, back and leg pain.  R. 560.  She said she fell in February, 2001.  *Id.*  This caused pain in her lower back, hip, neck, and down her left arm.  R. 567-568.  At that time (in early 2001), she said the pain was about a nine or ten.  R. 568.  On July 24, 2001, Plaintiff had neck surgery for injuries caused by the fall.  R. 560 and 569.  After the surgery, Plaintiff said that she had no pain, or pain at a two or three level.  R. 569.  She went back to work at that time as a cashier.  *Id.*  She said her neck and shoulder pain had only started up again two months before the hearing.  *Id.*

Plaintiff said that after she went back to work, she began to have pain in her lower back and arms, and missed a lot of work.  R. 569-570.  In 2001 and 2002, her pain was at a three or four level.  R. 570.  She was then working four hours a day, and

was given a stool to sit on.  *Id.*  She coped with the pain by working fewer work hours, taking pain medications, and resting.  *Id.* and R. 571.  She said that she had to have help from her son to dress herself.  R. 575.

Plaintiff said she also had problems with incontinence, high blood pressure, and depression.  R. 561.  She was taking Zoloft for depression.  R. 562.  She said she was depressed due to her health and inability to do things that she used to do.  *Id.*

Plaintiff said she was currently being treated by Dr. Gilbert at Bellview Express Care.  R. 562.  She said she saw him once a month.  *Id.*  She was also seeing a rehabilitation pain management doctor, who controlled her medications.  R. 562-563.  She said that at the time of the hearing she had another bulging disc at the site where she had had neck surgery, and another bulge at C4-C5, and the plan was to try physical therapy, then injections, and if that failed, to have more surgery.  R. 563.

Plaintiff said that she had low back pain and joint pain from fibromyalgia.  R. 564.  She said that sometimes her leg pain in both legs was at a six or seven level and she could not walk.  R. 564.  The pain was from the knee on down.  *Id.*  She said, however, that her "biggest problem" was in her neck and shoulders.  *Id.*

Plaintiff said she cleaned her home (vacuuming and sweeping) for awhile, and then had to rest for 15 to 20 minutes.  R. 565.  She drove a car and did grocery shopping, but said that carrying a gallon of milk, about eight pounds, caused pain.  *Id.* and R. 566  She went swimming for exercise, and daily walked a city block.  R. 565.

Plaintiff thought that she could stand for one half to three-quarters of an hour.  R. 567.  She thought she could sit for about an hour in a comfortable chair, but only 20

minutes on a dining room chair.  *Id.*  Sitting cause her back and tail bone to hurt, and her legs to ache.  *Id.*

Plaintiff said that she had had bladder surgery, and in September, 2001, still had problems with urinary incontinence.  R. 571.  She had to wear a pad, and if she coughed, laughed, bent, or moved she would lose control of her bladder and would soil her clothes.  R. 571-572.  She had to take numerous bathroom breaks, and her employer accommodated that need.  R. 572.

In September, 2001, she was also experiencing high blood pressure, causing headaches, dizziness, and shakiness.  R. 572.  She took over-the-counter migraine headache medications, tried to rest, and tried to calm down.  *Id.*  She also took blood pressure medication.  *Id.*

Plaintiff said that on some days she just does not care to do anything because she is always in pain.  R. 573.  She could no longer deer hunt, bowl, spend time with her children, activities that she used to enjoy.  *Id.*  In 2001, she had crying spells that lasted half an hour to an hour.  R. 573.

**Medical evidence in the record**[3]

On June 25, 2001, Plaintiff had an MRI of her cervical spine.  R. 268.  She reported neck and left shoulder pain since June 12, 2001.  *Id.*  It was noted by Dr. Lautz that that at C6-C7, Plaintiff had a "mild diffuse disc bulging and a large left-sided herniation that causes extrinsic mass effect on the cervical cord and on the exiting left

---

[3] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw.  Only the PDR 2005 and earlier are available.  Medical terms come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).nd1.html

C7 nerve root."  *Id.*  Slight disc bulges, but with no compromise of the cervical cord of exiting nerve roots, was also found at C4-C5 and C5-C6.  *Id.*

On July 2, 2001, Plaintiff was seen by Dr. Erickson.  R. 217.  He noted that she continued to have pain into her back and shoulder blade area, and down her left arm. *Id.*  He said that the pain was not controlled well with Vioxx[4] or Ultram,[5] though Vicodin[6] helped "a little, not a lot."  *Id.*  He found "some tenderness over the C5-6 area."  *Id.*  He noted the cervical cord compression on the C7 nerve root, and his assessment was C7 radiculopathy with a component of C6 involvement.  *Id.*  He noted no nerve root compression at C4-C5.  *Id.*  His diagnosis was cervical radiculopathy.  *Id.*  Roxicet[7] was prescribed.  *Id.*

On July 24, 2001, Plaintiff underwent an anterior cervical discectomy and fusion at C6-C7 performed by Dr. Mark K. Stevens.  R. 147-148.  By August 23, 2001, Plaintiff reported that her neck felt "great."  R. 154.  She said that all weekend she had pulled nails from boards without pain.  *Id.*

---

[4] Vioxx is a nonsteroidal anti-inflammatory drug (NSAID).  PHYSICIANS' DESK REFERENCE (2004), p. 2108.

[5] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid analgesic. Physicians' Desk Reference (2004), p. 2494.

[6] A brand name for Hydrocodone.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[7] Roxicet contains acetaminophen and oxycodone.  Oxycodone is a semisynthetic narcotic with multiple actions qualitatively similar to those of morphine.  Its principal therapeutic value is for analgesia and sedation.   PHYSICIANS' DESK REFERENCE (2005).

On November 12, 2001, Dr. Stevens wrote that Plaintiff "had a very nice recovery from the operation with resolution of her left upper extremity symptoms." R. 207. He reported that she still had "night pain," and he thought she "should be benefit[t]ed from physical therapy, heat, massage and ultrasound." *Id.* He thought that further treatment of her neck pain "will probably be periodic and lifelong." *Id.* He rated her disability at 15%, 10% for the surgery, and 5% for "continued ongoing neck pain." *Id.* He released Plaintiff "to full work at this time." *Id.*

Plaintiff reported for physical therapy again on December 18, 2001. R. 283-285. The initial evaluation was mixed. She moved without significant antalgic gait. R. 283. She guarded neck movements. *Id.* Some tenderness was noted upon palpation in several areas. R. 284. Flexion and rotation of joints were generally within normal limits. *Id.* Her strength was essentially normal in both upper and lower extremities. *Id.* It was also noted that Plaintiff had "some irritation in the hip and knee." *Id.* She was instructed as to exercises to do, and was able to do the exercises before leaving without increased pain. *Id.* She was to been seen two times a week. R. 285. Plaintiff, however, failed to return for her appointments, and on January 31, 2002, she was discharged from the rehabilitation program. R. 286.

On September 5, 2002, Plaintiff came to Dr. Erickson for a "recheck" of her right shoulder. R. 199. She said that it felt like her shoulder was better, and she did not have pain, especially when she did not use it. *Id.* She was able to rake that weekend and "did not wake with any significant increase in pain." *Id.* Her main concern that day was bladder control or stress incontinence, and she wore a pad at all times. *Id.* She was taking a diuretic for her blood pressure. *Id.* She reported that she had had a

bladder repair with her hysterectomy 15 years earlier.  *Id.*  On examination, Plaintiff had good range of motion of her right arm, but was still "mildly tender to palpation over the right shoulder."  *Id.*  She was to urinate regularly, every two hours, to cope with the stress incontinence.  R. 200.  She was to continue her medications, Zoloft,[8] Zestril,[9] and HCTZ.[10]  *Id.*

Plaintiff sought health care on March 24, 2003, complaining of "severe back pain."  R. 387.  Dolobid,[11] Flexeril,[12] and Darvocet N-100[13] were prescribed.  *Id.*  On May 12, 2003, she complained of neck pain.  R. 385.  A slight decrease of range of motion of her neck was observed.  *Id.*  On May 21, 2003, she returned again complaining of "severe pain" in her neck.  R. 382.  She apparently was to see a neurosurgeon, but had not seen him yet because an MRI was needed.  *Id.*  It was noted that an MRI was pending.  *Id.*

---

[8] Zoloft is prescribed to treat major depressive disorder, obsessive-compulsive disorder, panic disorder, posttraumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder.  PHYSICIANS' DESK REFERENCE (2004), pp. 2891-2892.

[9] Zestril contains lisinopril, an oral long-acting angiotensin converting enzyme inhibitor, used for hypertension.  PHYSICIANS' DESK REFERENCE (2005).

[10] HCTZ is hydrochlorothiazide, a thiazide diuretic.  PHYSICIANS' DESK REFERENCE (2005).

[11] Dolobid is the brand name for diflunisal, which is a nonsteroidal anti-inflammatory. It is prescribed for relief of mild or moderate pain, rheumatoid arthritis, and osteoarthritis.  PHYSICIANS' DESK REFERENCE (2005).

[12] Flexeril is prescribed as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions.  PHYSICIANS' DESK REFERENCE (2004), p. 1985.

[13] Darvocet-N 50 or 100 contains propoxyphene hydrochloride, a mild narcotic analgesic related to methadone.  PHYSICIANS' DESK REFERENCE (2004), pp. 403-404.

On June 28, 2003, another MRI found that Plaintiff was "status post anterior cervical diskectomy C7/T1." R. 499. A "prominent central disk protrusion which measures 4.0 mm in height and 9.0 mm across the base" was noted at C4-C5. *Id.* This was also described as a "significant disk protrusion" at this level, with "some mass effect on the left side of the spinal cord with flattening but no appreciable edema." *Id.* No abnormalities were noted at C2-C3, C3-C4, and C6-C7, and very mild abnormalities at C5-C6. *Id.*

Plaintiff had a mental health examination on August 19, 2003, by Bernard B. Bulcourf, Ph.D. R. 338-341. She reported she had been sexually abused by her biological father from age 5 to age 21, and raped three times as a teenager. R. 340. Her mood was "moderately depressed and anxious." R. 340. Her diagnosis was major depressive disorder and somatization disorder. *Id.* Her problems were listed as health concerns, unemployment status, unstable residence, limited vocational skills, social isolation, poor finances pending bankruptcy, multiple bereavement issues, unresolved abuse issues, family discord, and separation from her husband. R. 340-341. On Axis V[14] her current GAF[15] score was 55. R. 341. Her prognosis was:

---

[14] Axis V of the DSM-IV Multiaxial System is explained at: http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[15] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

> GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Manual at 34. GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech,

> Prognosis for sedentary-light duty type work with continued psychotropic medication intervention and mental health counseling is guarded-good from a psychological standpoint. Her past work history suggested that despite her multiple medical issues she has been able to be employable. *However, her emotional and health functioning will fluctuate resulting in short duration employment.*

R. 340 (emphasis added). Due to her "poor coping with multiple health and psychosocial stressors," it was recommended that she have ongoing psychotherapy and psychotropic medications, and vocational rehabilitation. *Id.*

Plaintiff was examined on a consultative basis by Lance Chodosh, M.D., on August 21, 2003. R. 342. Dr. Chodosh noted the recent MRI, showing "deterioration of other cervical discs, and further surgery has been proposed." *Id.* Plaintiff reported that the pains were "dull, severe, sometimes knife-like or stabbing. Lifting, or other activities tend to increase pain." *Id.* He also noted the diagnosis of fibromyalgia five years earlier, and that Plaintiff experiences "aches and pains everywhere, including jaws, hands, legs, back, shoulder, and elbows." *Id.* Plaintiff reported that she sometimes needs help with her shoes, and used a shower stool, but was "generally independent in activities of daily living." *Id.* She said she was limited to walking one block due to leg pain, back pain, and breathing problems. *Id.* Plaintiff smokes a pack of cigarettes a day. *Id.* Plaintiff could not bend well at the waist, and was completely unable to squat and rise. *Id.* Plaintiff said that she avoided lifting anything weighing over 15 pounds

---

occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

due to pain.  *Id.*  She said that her hands cramped and hurt with prolonged use, but she

had adequate dexterity.  *Id.*  She was able to drive a motor vehicle for short periods.  *Id.*

Upon examination, Plaintiff exhibited "moderately severe pain behavior, limiting

cooperation and functional assessment."  R. 343.  In her extremities, Dr. Chodosh found

that Plaintiff had "no edema, cyanosis, clubbing, deformity, or varicosity. . . .  All joints

have full range of motion."  R. 344.  He said that she had no spinal deformity,

tenderness or paraspinal muscle spasm.  *Id.*  "Straight leg raise difficult to assess while

supine because of pain behavior, but negative to 90° sitting, bilaterally."  *Id.*  Motor

strength and function was grossly normal in all four extremities.  *Id.*  Plaintiff's gait was

slow, without specific abnormality.  *Id.*  Standing was normal.  *Id.*

Dr. Chodosh's impression was chronic pain in Plaintiff's neck and upper

extremities, but without objective evidence of major impairment in those areas.  R. 345.

He said:

> In my opinion, and based only on objective evidence:  the claimant is able
> to see, hear, and speak normally.  She is physically able to walk and stand
> normally.  She is physically able to sit in [a] normal fashion.  She is able to
> bend at the waist at least occasionally, and to lift and carry approximately
> twenty pounds for short periods of time.  She is probably not able to squat
> or kneel well.  She is able to handle objects of moderate weight and size
> at least occasionally.  She is able to travel.  She is able to comprehend
> and follow directions, and is able to relate normally to others.

R. 345.

On July 8, 2005, Plaintiff was seen by Dr. Anuj Sharma at Southeastern

Rehabilitation Medicine.  R. 514-516.  Plaintiff complained of "pain, particularly in the

neck, but all over her entire body."  R. 514.  It was noted that she had been diagnosed

as having fibromyalgia.  *Id.*  Her medical history also showed that she suffered from

arthritis in multiple joints, sleep apnea, restless leg syndrome, asthma, anxiety, depression, high blood pressure, and diverticulitis.  *Id.*  She came to Dr. Sharma for pain management.  *Id.*  Plaintiff reported that her pain was moderate to severe and continuous.  *Id.*  Standing, walking, driving, and bending made the pain worse.  *Id.*  Doing nothing made the pain better.  *Id.*  Plaintiff reported numbness and tingling in her hands and feet.  *Id.*  Upon examination, it was found that Plaintiff was overweight, had a labored gait, and her range of motion of the neck was also labored.  R. 515.  No acute pain behavior was noticed.  *Id.*  He found that Plaintiff had symmetric motor strength in all major joints, but had tissue tightness with palpation over the neck, and tissue tightness and tenderness over the bilateral lateral epicondyles,[16] biciptal[17] tendons, hips, knees, and pes[18] anserine[19] bursa[20] region.  R. 516.  Dr. Sharma's impression was chronic pain syndrome, fibromyalgia syndrome, history of C6-C7 cervical fusion with failed neck syndrome, multi-joint osteoarthritis, restless leg syndrome, depression, anxiety, and sleep apnea.  *Id.*  He recommended EMG testing to determine the cause of paresthesias in Plaintiff's hands, physical rehabilitation, continuation of Flexeril and

---

[16] An epicondyle is an eminence upon a bone, above its condyle.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[17] Biciptal means having two heads, or it pertains to a biceps muscle.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[18] Pes means foot or any footlike part.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[19] Anserine is pertaining or like a goose.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[20] A bursa is a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

diflunisal (Dolobid), and perhaps try a greater strength pain medication. *Id.* She was to return in two weeks for a follow-up. *Id.*

On July 22, 2005, Plaintiff was seen again by Dr. Sharma. R. 512. This was a follow-up appointment for management of low back pain, and Dr. Sharma said he also "reviewed issues of fibromyalgia." *Id.* Plaintiff brought in her MRI for review. *Id.* No acute pain behavior was noticed by Dr. Sharma, but her gait and range of motion in her neck was "labored." *Id.* His impression was the same as two weeks earlier, chronic pain syndrome, fibromyalgia syndrome, history of C6-C7 cervical fusion with failed neck syndrome, multi-joint osteoarthritis, restless leg syndrome, depression, anxiety, and sleep apnea, but her lumbar spine by the MRI was normal. R. 513. He again recommended EMG testing and physical rehabilitation. *Id.*

On September 6, 2005, Plaintiff returned to Dr. Sharma. R. 509. She reported that the pain had increased in her neck, now going down into her left arm and hand, the same as before her neck surgery. *Id.* Plaintiff had run out of Lortab. *Id.* Her medications had been helpful. *Id.* A nerve conduction velocity test and an EMG test indicated abnormalities. R. 510. Dr. Sharma said that the results were "suggestive of chronic, with possible acute, denervation noted in C6-7 distribution." *Id.* He said that "[g]ive the increased severity of the patient's issues, and possible new distribution of her symptoms, I will order [an] MRI of the cervical spine." *Id.* He continued Flexeril and hydrocodone and scheduled a follow-up in four weeks. *Id.*

Another MRI was conducted on September 9, 2005. R. 507. The impression was:

> The most significant findings are noted at C4-C5, with moderate central
> canal stenosis and moderate-sized disk herniation.  Otherwise, the neural
> foramina appear unremarkable.  There is a small left paracentral disk
> herniation at C6-C7 [the site of the previous surgery], with narrowing of the
> left lateral recess.  There is no evidence of abnormal enhancement.

R. 507.

On August 9, 2006, after the ALJ had rendered his decision, Plaintiff's attorney

submitted a "Treating Physician's Medical Assessment of Ability to do Work Related

Activities Form" to the Appeals Council.  R. 551.  The Form was completed on June 23,

*2005*, by a physician at Dr. Express Care of Belleview.  Plaintiff did not explain why the

form was not presented to the ALJ at the administrative hearing on November 6, 2005.

The physician said that Plaintiff had decreased upper body strength upon examination,

and could lift and carry only ten to twenty pounds.  R. 552.  It was thought that Plaintiff

could stand and walk only one to two hours per day, and could sit for less than one hour

per day according to the patient's history.  R. 553.  It was the physician's opinion that

Plaintiff would need to rest every one to two hours during the day, but said that no

medical findings supported this assessment.  R. 554.  When asked if there was any

evidence of malingering, the physician said "not at this visit but I suggest an

investigation (i.e. surveillance); for example, anyone can demonstrate [decreased]

strength for the extremities."  *Id.*  The physician found, however, that Plaintiff's assertion

that she must lie down up to one to two hours in an eight hour day was probably

reasonable.  R. 555.  The physician also said that Plaintiff was prescribed Lortab, a

narcotic, and that would interfere with Plaintiff's mental alertness and have other side

effects.  R. 556.

**Legal analysis**

Plaintiff contends that question to be resolved by this court is whether the

Administrative Law Judge violated the 11th Circuit pain standard.  Doc. 13, pp. 1, 9

(headings).  Plaintiff contends that the ALJ discounted Plaintiff's credibility "with no

evidentiary basis for doing so."  *Id.*, p. 9.  Plaintiff set forth some of the medical

evidence and an excerpt of Plaintiff's testimony in her memorandum.  Doc. 13, pp. 11-

16.  Plaintiff argues that the medical evidence of cervical disk herniation and nerve root

compression is sufficient to meet pain criterion (1)(b) above, as an "objectively

determined medical condition [that] can reasonably be expected to give rise to the

claimed pain."  *Id.*, pp. 17-18.  Plaintiff asks the court to remand the case to the

Administrative Law Judge "to properly assess GUNN's credibility regarding her

subjective complaints of pain."  *Id.*, p. 18.

The Administrative Law Judge discounted Plaintiff's pain testimony, setting forth

the following reasons:

> The claimant's testimony and other reports reflect that she lives a light
> type lifestyle, which is consistent with the medical evidence.  Reports of
> record indicate that she is able to cook, perform light housekeeping, and is
> able to take care of her personal grooming.  She visits or goes out with
> friends and relatives and gets along well with family, people in authority
> and with the public.  (Exhibit 8E).  She is able to take care of her activities
> of daily living.  Activities and reports such as these are inconsistent with
> her allegations of incapacitating limitations or depression.  This is not to
> minimize the medical impairment demonstrated in the record.  The
> claimant does have impairments that limit her activities such as heavy
> lifting.  However, the clinical findings resulting from these impairments do
> not appear to be of a degree capable of producing limitations of
> incapacitating proportion.  Accordingly, the undersigned finds that the
> claimant's allegations and subjective symptoms are out of proportion and
> inconsistent with the medical evidence and are not fully credible (SSR 96-
> 7p).

R. 24-25.

Exhibit 8E is not substantial evidence in the record to support these findings as to the extent of Plaintiff's daily activities.  Exhibit 8E[21] is Plaintiff's own description of her "activities of daily living," and that exhibit is consistent with her testimony, describing significant limitations.  She said she cooks sometimes twice a day, but needs help lifting some of her pots and pans, chopping, mixing, and straining things.  R. 121.  She said she cannot stir dough, lift pots and pans when food is in them, and she said that chopping is too hard on her hands and arms.  *Id.*  She said she goes shopping only if her fifteen year old son or someone else can go with her to lift the groceries for her.  *Id.*  She indicated she can put groceries weighing less than five pounds into the cart, but she needs help lifting the bags and carrying them into the car of the house.  *Id.*  She said she takes about two days to clean her house, depending upon the pain.  R. 123.  She cleans, then rests.  *Id.*  She vacuums half of a room, and then rests.  *Id.*  She does laundry and the dishes the same way.  *Id.*  She said she no longer can take a bath, but takes a shower sitting on a stool.  *Id.*  Some days she needs help dressing.  *Id.*  She said she cannot ride in a car for a long period of time.  *Id.*  Other activities that she said have been impaired are riding a bike, swimming, hanging clothes, and sports.  *Id.*  She said she is not active in church, clubs, or other social groups, but engaged in these social activities before her condition began.  *Id.*  She said that she does visit with friends and relatives, and gets along "great with everybody as long as I am mentally and physically able to associate."  R. 125.  She said that "a lot of days I stay home or in bed

---

[21] The pagination of Exhibit 8E skips pages 122 and 124, but all four pages of Exhibit 8E are in the record as R. 121, 123, 125, and 126.

because I am in pain or don't feel like being around people or don't want to bother them with my problem."  *Id.*  She said she got alone well with people in authority or with the public.  *Id.*  Plaintiff said that due to her disability, she "missed work, left work early, had to take extra breaks," and her doctor ordered her to quit her last job.  R. 126.  She said that working made her condition worse.  *Id.*

Plaintiff's testimony at the administrative hearing is substantial evidence to find that Plaintiff engages in "light style" daily activities, but not, as the ALJ then found, without significant limitations.  She said she had to rest after cleaning her house for 15 or 20 minutes, and had trouble lifting a gallon of milk.  She said she could sit no longer than an hour in a comfortable chair without pain.

In summary, the evidence of Plaintiff's daily activities cited by the ALJ is not substantial evidence in the record to support the determination that she exaggerated her symptoms.  Further, the Eleventh Circuit has cautioned that the Commissioner not place too much emphasis on "daily activities" evidence.  Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering

daily activities, the entire record must be considered, including the claimant's testimony

that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553,

1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis

for failing to believe her testimony as to pain was insufficient where there was a medical

condition that reasonably could have given rise to the pain described, and, although she

testified that she cooked and shopped for herself, she had trouble putting on her

clothing).

The only other basis for discounting Plaintiff's pain testimony in this passage is

the ALJ's finding that "the clinical findings resulting from these impairments do not

appear to be of a degree capable of producing limitations of incapacitating proportion."

This is a conclusion without sufficient explanation because it does not cite to substantial

evidence in the record.  There is no reference to specific clinical findings showing only

mild spinal defects that would not likely cause disabling pain.  More seriously, the

clinical findings cover several years, and this statement does not differentiate between

the two applications.  There are two applications, for disability insurance benefits and for

supplemental security income benefits.  The clinical findings that are important for a

determination of disability insurance benefits are those in temporal proximity to

September 30, 2001.  The clinical findings relevant to the decision on the supplemental

security income application would be in temporal proximity to the date of application,

April 11, 2003, to the date of the decision, February 2, 2006.

The Commissioner seeks to remedy this problem by pointing to evidence in the

record that the ALJ might have mentioned to support his finding that Plaintiff's testimony

was not credible.  First, the Commissioner points out that Plaintiff had neck surgery in

July, 2001, and by September, 2001, when her insured status for disability insurance benefits expired, her neck pain had greatly diminished as a result of successful surgery. Doc. 16, p. 10.  This, argues the Commissioner, fully supports the finding that Plaintiff could do light work on the date that her insured status expired.

The Commissioner also argues that after September, 2001, Plaintiff's "serious neck problems remained relatively quiescent, with Plaintiff seeking little consistent treatment for her alleged disabilities."  Doc. 16, pp. 10-11.  This argument is relevant to the determination that on September 30, 2001, Plaintiff did not have an impairment likely to last 12 months, a necessity for an award of disability insurance benefits.  It also is relevant to the determination that from April 11, 2003 (date of the application), to February 2, 2006 (date of the decision), Plaintiff did not have an SSI disability.  The Commissioner argues that it was not until September, 2005, that Plaintiff appeared to have renewed complaints of neck pain.  *Id.*, p. 11.  While not mentioned by the Commissioner here, there was clinical evidence supportive of this complaint.  On September 9, 2005, there were MRI findings of disc herniation at C4-C5, R. 507, and a few days earlier, nerve conduction velocity and EMG studies revealed abnormalities, R. 510.  The Commissioner argues that there was no evidence that this new impairment, revealed in September, 2005, would last 12 months, or if so, it could have been the subject of a new SSI application.  Doc. 16, p. 11.

When this court judicially reviews an administrative action of an agency of the executive branch, it may not "substitute counsel's *post hoc* rationale for the reasoning supplied by the" agency itself.  N.L.R.B. v. Kentucky River Community Care, Inc., 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d 939 (2001), *quoting*, N.L.R.B.

v. Yeshiva Univ., 444 U.S. 672, 685, n. 22, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (citing

Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct.

1575, 1577, 91 L.Ed. 1995 (1947)[22]); Real v. Simon, 514 F.2d 738, 739 (5th Cir. 1975)

(denying rehearing of Real v. Simon, 510 F.2d 557 (5th Cir. 1975)); Golembiewski v.

Barnhart, 322 F.3d 912, 916 (7th Cir. 2003); Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7

(3d Cir. 2001).  However,

> While we may not supply a reasoned basis for the agency's action that the
> agency itself has not given [citing Chenery Corp.], we will uphold a
> decision of less than ideal clarity *if the agency's path may reasonably be
> discerned.*

Manasota-88, Inc. v. Thomas, 799 F.2d 687, 691 (11th Cir. 1986) (emphasis added).

The Commissioner's path cannot reasonably be discerned here for lack of a

discussion of the specific clinical findings supportive of the conclusion that Plaintiff's

pain testimony was not credible to the degree alleged.  A remand is needed.

As explained in Melkonyan v. Sullivan, 501 U.S. 89, 111 S.Ct. 2157, 115 L.Ed.2d

78 (1991), a remand may be pursuant to either sentence four or sentence six of 42

U.S.C. § 405(g).  "The fourth sentence of § 405(g) authorizes a court to enter 'a

---

[22] Chenery Corp. held:

> When the case was first here, we emphasized a simple but fundamental
> rule of administrative law.  That rule is to the effect that a reviewing court,
> in dealing with a determination or judgment which an administrative
> agency alone is authorized to make, must judge the propriety of such
> action solely by the grounds invoked by the agency.  If those grounds are
> inadequate or improper, the court is powerless to affirm the administrative
> action by substituting what it considers to be a more adequate or proper
> basis.  To do so would propel the court into the domain which Congress
> has set aside exclusively for the administrative agency.

Chenery Corp., 332 U.S. at 196, 67 S.Ct. at 1577.

judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.' "  501 U.S. at 98, 111 S.Ct. at 2163.  A sentence six remand is to gather new evidence.[23]

A remand is not needed to gather new evidence.  Therefore, a sentence four remand is recommended.  On remand, the Commissioner must identify specific evidence in the record relevant to the determination of Plaintiff's testimonial credibility. The Commissioner must also distinguish between the temporal differences between the two pending applications with respect to these findings.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the case **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) so that the Commissioner

---

[23]   The sixth sentence of § 405(g), as we explained in *Finkelstein* [*Sullivan v. Finkelstein*, 496 U.S. 617, 628, 110 S.Ct. 2658, 2665, 110 L.Ed.2d 563 (1990)], "describes an entirely different kind of remand."  *Id.*, at 626, 110 S.Ct., at 2664.  The district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination.  Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding. Ibid.  The statute provides that following a sentence six remand, the Secretary must return to the district court to "file with the court any such additional or modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based."  42 U.S.C. § 405(g).

501 U.S. at 98, 111 S.Ct. at 2163.

may enter specific findings concerning a determination of Plaintiff's testimonial credibility

as discussed herein.

     **IN CHAMBERS** at Tallahassee, Florida, on September 14, 2007.


          **s/    William C. Sherrill, Jr.**
          **WILLIAM C. SHERRILL, JR.**
          **UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

     **A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**